09 CV 8376

BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
EVER FRIENDSHIP NAVIGATION LTD.
355 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500
Fax: (212) 983-5946

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
EVER FRIENDSHIP NAVIGATION LTD.,

                      Plaintiff,

    -against-

GLOBAL LOGISTICS GROUP LTD., ALTOMAR
MARITIME INC., and AMERICAN GLOBAL
LOGISTICS (CANADA) LTD.,

                      Defendants.
------------------------------------------------------------------X

09 Civ.

**VERIFIED COMPLAINT**

Plaintiff, EVER FRIENDSHIP NAVIGATION LTD. ("Plaintiff"), by its attorneys,

Brown Gavalas & Fromm LLP, as and for its Verified Complaint against defendants, GLOBAL

LOGISTICS GROUP LTD. ("Global Logistics"), ALTOMAR MARITIME INC. ("Altomar"),

and AMERICAN GLOBAL LOGISTICS (CANADA) LTD. ("AGL CANADA") (collectively,

"Defendants"), alleges upon information and belief as follows:

    1.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully

appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal

Rules of Civil Procedure.  The Court has jurisdiction under 28 U.S.C. § 1333.

    2.     At all material times, Plaintiff was and now is a foreign corporation organized and

existing under and by virtue of the laws of a foreign country with an office and place of business

in Valletta, Malta.

3.     Upon information and belief, at all material times defendant Global Logistics was and still is a foreign corporation organized and existing under and by virtue of the laws of the Marshall Islands, with a registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, and an office and place of business c/o Altomar at 5995 Gouin Boulevard West, Suite 200, Montreal, Canada.

4.     Upon information and belief, at all material times defendant Altomar was and still is a foreign corporation organized and existing under and by virtue of the laws of Canada, with an office and place of business at 5995 Gouin Boulevard West, Suite 200, Montreal, Canada.

5.     Upon information and belief, at all material times defendant AGL Canada was and still is a foreign corporation organized and existing under and by virtue of the laws of Canada, with an office and place of business at 5995 Gouin Boulevard West, Suite 200, Montreal, Canada.

6.     At all material times, Plaintiff was the registered owner of the motor vessel FRIENDSHIP ("the Vessel").

7.     On or about April 20, 2007, Plaintiff, as owner, and Global Logistics, as charterer, entered into a charter agreement whereby Plaintiff agreed to let, and Global Logistics agreed to hire, the Vessel, under certain terms and conditions, for a period of fifteen months, fifteen days more or less in Charterer's option. ("the Charterparty").  In an addendum to the Charterparty, the parties later agreed to extend the Charterparty period for an additional nine months, for a total of twenty-four months, fifteen days more or less in Charterer's option.  Annexed hereto as Exhibit "A" is a true and correct copy of the Charterparty.

8.     Under the terms of the Charterparty, as amended by the parties' agreements, for the period from April 2009 until the termination of the Charterparty on October 13, 2009, Global

Logistics was required to pay to Plaintiff hire at the rate of $5,300.00 per day pro rata, including overtime, payable every 15 days in advance. Global Logistics is also required to pay a $210,000.00 balloon payment at the end of the Charterparty period.

9.    Under the terms of the Charterparty, Global Logistics was required to re-deliver the Vessel to Plaintiff at a safe port in the Mediterranean Sea, Black Sea, or Continental Europe.

10.    Plaintiff delivered the Vessel to Global Logistics pursuant to the terms of the Charterparty on or about October 28, 2007 and Plaintiff has otherwise fully performed its obligations under the Charterparty.

11.    Despite its contractual obligation to pay Plaintiff hire of $5,300.00 per day every fifteen days in advance, Global Logistics has failed and refused to pay hire due to Plaintiff for the period from September 2, 2009 until the end of the Charterparty period on October 13, 2009, for which the amount of $420,551.25 is currently due and owing.

12.    Global Logistics failed to re-deliver the Vessel to Plaintiff at a safe port in the Mediterranean Sea, Black Sea, or Continental Europe, and instead re-delivered her in the Caribbean Sea, in breach of the Charterparty. Plaintiff will incur costs and other expenses to re-position the Vessel to one of the re-delivery ports agreed to in the Charterparty. As best as can be presently estimated, such costs and expenses total $63,170.00, for which Global Logistics is liable.

13.    Under the terms of the Charterparty, all disputes between the parties are to be decided by arbitration in London, pursuant to English law. Plaintiff anticipates commencing London arbitration proceedings imminently.

14. This action is in aid of said London arbitration proceedings in accordance with 9 U.S.C. § 8. Plaintiff seeks to obtain adequate security to satisfy a potential London arbitration

award in Plaintiff's favor.

15. In addition to recovering the principal amount due Plaintiff, Plaintiff also fully anticipates recovering interest, costs, and attorneys' fees, which are routinely awarded to the prevailing party in London arbitration proceedings. As best as can now be estimated, Plaintiff expects to recover the following amounts in the London arbitration:

a. On the principal claim (¶¶ 11-12)                    $483,721.25

b. Interest for a period of three years, at
   6% per annum, compounded quarterly              $94,624.67

c. Legal Costs (estimated)                              $160,000.00[1]

TOTAL                                                  $738,345.92

## AS AND FOR A CLAIM FOR ALTER EGO LIABILITY

16.    Upon information and belief, the Defendants are affiliated and commonly controlled entities and, at all relevant times held, and continue to hold, themselves out to the world as being associated companies and are recognized as such within the maritime and shipping community.

17.    Defendants conduct their operations as if they were one company. For example, Altomar's website, accessible at http://www.altomar.com, formerly stated that Altomar "has presently 2 major principals with whom it has developed a long standing relationship, these being *High Seas Shipping Ltd.* and *Global Logistics Group Ltd.*"

18.    The Charterparty bears Altomar's seal, even though Altomar is not a party to the Charterparty and the Charterparty was signed by Peter Salway for AGL Canada, purportedly "As

---

[1] This is based on estimated costs of two arbitrators at £200/ hour, including writing the award; say £25,000. Costs for Barristers for the London arbitration say £20,000. Solicitor's costs, including submissions, witness statements, disclosure, reporting to clients, say at £300 per hour, i.e. £40,000. Costs for experts, say £5,000. Miscellaneous costs, say £10,000. Total: £100,000 or $159,295.00, based on a conversion rate of £1 = $1.59295 (*See* http://www.xe.com/ucc).

General Agents for and on behalf of" Global Logistics.

19.    Upon information and belief, Defendants share the following employees: John Pragelas and Peter Salway.

20.    Upon information and belief, Defendants share common offices, telephone and fax lines, and personnel at 5995 Gouin Boulevard West, Suite 200, Montreal, Canada.

21.    Upon information and belief, the Defendants, including Global Logistics, "are widely perceived to be controlled by John Pragelas," based upon the results of a private investigation commissioned by Plaintiff.

22.    Global Logistics' letterhead states its address as "C/o Altomar Maritime Inc." and provides Altomar's address and contact information as its own.

23.    Upon information and belief, the Defendants intermingle funds and fail to keep separate accounts.  Specifically, hire payments made by Global Logistics to Plaintiff were made c/o AGL Canada, 5995 Gouin Blvd West, Suite 200 Montreal, Quebec, Canada.

24.    Upon information and belief, defendants Global Logistics, Altomar, and AGL Canada, and each of them, completely controlled, dominated, managed, and operated each other, and/or disregarded their respective corporate form, and/or conducted business and operations of each of the entities as if the same were their own.

25.    Adherence to the fiction of the separate existence of the Defendants as entities distinct from one another would permit an abuse of the corporate privilege and would sanction fraud and promote injustice given the breach and wrongful conduct of said Defendants, as alleged more particularly herein.

26.    Plaintiff has conducted an investigation as set out in the accompanying affidavit of Peter Skoufalos and Plaintiff verily believes that Defendants cannot be found within the

District, within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure.

27.    Defendants are members of a trading group that charters and manages vessels in order to ship goods worldwide for third parties.  Consequently, it is believed that Defendants will be making hire and/or freight payments to the owners of vessels chartered by Defendants. Further, Defendants will be receiving dollar-denominated payments from entities that charter vessels from Defendants.  Moreover, Defendants will likely be making dollar-denominated payments in payment of Defendants' own commercial obligations.

28.    The hire payments due under the Charterparty were transmitted through New York banks.  Specifically, the hire payments made by Global Logistics were made through ABN Amro Bank.

29.    Upon information and belief, and based on invoices issued by Global Logistics, Global Logistics has also received hire payments that were routed through New York banks. Specifically, Global Logistics directed hire payments for the vessel M/V AFEA to be routed through JP Morgan Chase Bank.

30.    It is the well-established custom and practice of the industry, that charter hire or freight paid by charterers for the charter of vessels, is payable in United States Dollars.  In addition, bunker fuel for ships, which must often be paid for by the charterer, is customarily quoted and paid for in United States Dollars.  Further, agents' invoices for services and disbursements rendered to vessels at local ports are customarily rendered and paid in United States Dollars.

31.    Upon information and belief, Defendants cannot be found within the District, within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure, but are believed to have or will have during the pendency of this action assets within this District,

specifically including cash, funds, freight, hire, accounts, electronic fund transfers and other property, in the hands of garnishees in the District including, but not limited to, American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are believed to be due and owing to the Defendants.

Plaintiff prays:

A.  That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendants, citing them to appear and answer under oath all matters alleged in the Verified Complaint;

B.  That because the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules and the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all cash, goods, chattels, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee, including American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are due and owing to the Defendants, in the amount of $738,345.92, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B, answer the matters alleged;

C.  That this action be stayed and this Court retain jurisdiction over this matter through

the entry of any judgment or award, and any appeals thereof; and

    D.  That Plaintiff have such other, further and different relief as this Court may deem just

and proper.

Dated: New York, New York
       October 2, 2009

                   BROWN GAVALAS & FROMM LLP
                   Attorneys for Plaintiff
                   EVER FRIENDSHIP NAVIGATION LTD.

By: _____
       Peter Skoufalos (PS-0105)
       355 Lexington Avenue
       New York, New York 10017
       Tel: (212) 983-8500
       Fax: (212) 983-5946

## VERIFICATION

STATE OF NEW YORK    )
: ss.:
COUNTY OF NEW YORK  )

      PETER SKOUFALOS, being duly sworn, deposes and says:

1.    I am a member of the bar of this Honorable Court and of the firm of Brown Gavalas & Fromm LLP, attorneys for Plaintiff.

2.    I have read the foregoing Verified Complaint and I believe the contents thereof are true.

3.    The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.    The sources of my information and belief are documents provided to me and statements made to me by representatives of the Plaintiff.


                        PETER SKOUFALOS

Sworn to before me this
2nd day of October, 2009

_____
    Notary Public

EVAN B. RUDNICKI
Notary Public of the State of New York
No. 02RU6142314
Qualified in Rockland County
Term Expires March 13, 2010

# EXHIBIT "A"

Code Name: "NYPE 93"
Recommended by-
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASSA)



Altomar Maritime Inc.

## TIME CHARTER©
New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.). Inc*

November 6th 1913 – Amended October 20th 1921: August 6th 1931; October 3rd 1946:
Revised June 12th 1981; September 14th 1993

| | |
|---|---|
| **THIS CHARTER PARTY**. made and concluded in **Montreal, Canada** | 1 |
| this **20th** day of **April** ~~2006~~ **2007** | 2 |
| Between **Ever Friendship Navigation Ltd of Malta** | 3 |
| | 4 |
| <u>Owners</u> of the Vessel described below, and | 5 |
| | 6 |
| <u>Charterers</u>. **Global Logistics Group Ltd., Ajeltake Island, Majuro, Marshall Island MH 96960** | 7 |
| | 8 |
| <u>Description of Vessel</u> | 9 |

| | |
|---|---|
| Name **MV Friendship** Flag **Malta** Built **2007** (year). | 10 |
| Port and number of Registry **Valletta** | 11 |
| Classed in | 12 |
| Deadweight **8000** long*/metric* tons (cargo and bunkers including freshwater and | 13 |
| stores not exceeding long*/metric* tons) on a salt water draft of | 14 |
| on summer freeboard. | 15 |
| Capacity cubic feet grain **7800** cubic **meters feet** bale space. | 16 |
| Tonnage GT/GRT. | 17 |
| Speed about **11.5** knots fully laden. in good weather conditions up to and including maximum | 18 |
| Force **3** on the Beaufort wind scale, on a consumption of about **7.5** long*/metric* | 19 |
| tons of **IFO (180 CST) + 1.5 MT GASOIL** | 20 |

| | |
|---|---|
| * Delete as appropriate. | 21 |
| For further description see ~~Appendix "A" (if applicable)~~ see Clause 52 | 22 |

| | |
|---|---|
| 1. <u>Duration</u> | 23 |

| | |
|---|---|
| The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period | 24 |
| Of **15 months 15 days more or less in Charterers option** | 25 |
| | 26 |
| | 27 |
| within below mentioned trading limits. | 28 |

| | |
|---|---|
| 2. <u>Delivery</u> | 29 |

| | |
|---|---|
| The Vessel shall be placed at the disposal of the Charterers at **Linhaishi Changhua Shipbuilding Co. Ltd yard** | 30 |
| **With laycan between August and September 2007** | 31 |
| | 32 |
| The Vessel on her delivery | 33 |
| shall be ready to receive cargo with clean-swept holds and tight staunch, strong and in every way fitted | 34 |




1994

for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear simultaneously.                                                                                                                                35
36

The Owners shall give the Charterers not less than **25, 15, 10, 7, 5, 4, 3, 2, 1** notice of expected date of delivery.                                                                                                                                37
38

3.    **On-Off Hire Survey**  (see Clause 61)
39

~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their~~    40
~~respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct~~    41
~~joint on-hire/off-hire surveys for the purpose of ascertaining quantity of bunkers on board and the condition~~    42
~~of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without~~    43
~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~    44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~    45
~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~    46
~~On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.~~    46
47

4.    **Dangerous Cargo/Cargo Exclusions** (see Clause 73)

(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,    48
injurious, flammable or corrosive nature unless carried in accordance with the requirements or    49
recommendations of the competent authorities of the country of the Vessel's registry and of ports of    50
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must    51
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically    52
excluded livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials.    53
54
55
56
57
58
59
60
61
62
63

~~(b) If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~    64
~~                    tons and the Charterers shall provide the Master with any evidence he may~~    65
~~reasonably require to show that the cargo is packaged, labeled, loaded and stowed in accordance with IMO~~    66
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~    67
~~the Charterers risk and expense.~~    68
69

5.    **Trading Limits** (see Clause 74)
70

~~The Vessel shall be employed in such lawful trades between safe ports and safe places~~    71
~~within~~    72
73
                                                                                                    ~~excluding~~    73
74
75
                                                                        ~~as the Charterers shall direct.~~    76

6.    **Owners to Provide**
77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for    78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for    79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the    80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and    81
equipment for and during the service. and have a full complement of officers and crew.    82





7.    Charterers to Provide                                                                                                83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise      84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory            85
garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages,       86
towages, agencies, commissions, consular charges (except those pertaining to individual crewmembers           87
or flag of the Vessel), and all other usual expenses; except those stated in Clause 6, but when the Vessel     88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all    89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew          90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while        91
the Vessel is employed under this Charter Party shall be for the Charterers' account. All other fumigations    92
shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six       93
months or more.                                                                                                94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a         95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard          96
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in    97
their time.                                                                                                    98

8.    Performance of Voyages                                                                                               99

(a) The Master shall perform the voyages with due dispatch, and shall render all customary assistance          100
with the Vessel's crew. The Master shall be conversant with the English language and (although                 101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards                 102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to       103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk  104
and expense, *but always* under the supervision *and responsibility* of the Master.                            105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or         106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if           107
necessary, make a change in the appointments.                                                                  108

9.    Bunkers *(also see Clause 72)*                                                                                       109

~~(a) The Charterers on delivery and the Owners on redelivery, shall take over and pay for all fuel and~~      110
~~diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with:~~                 111
~~                      long*/metric* tons of fuel oil at the price of                          per ton;~~     112
~~                      tons of diesel oil at the price of                 per ton          The vessel shall~~  113
~~be redelivered with:                         tons of fuel oil at the price of~~                              114
~~                      tons of diesel oil at the price of                              per ton;~~             115
~~                                                                                              per ton.~~

~~* Same tons apply throughout this clause.~~                                                                   116

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines              117
and auxiliaries and which conform to the specification(s) as set out in *Appendix A Clause 52*                 118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines       119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed                120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed               121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners  122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker      123
consumption, nor for any time lost and any other consequences.                                                 124





10.    **Rate of Hire / Redelivery Areas and Notices**

The Charterers shall pay for the use and hire of the said Vessel at the rate of $ **5600.00**     125
U.S. currency *for the 1ˢᵗ 45 days to the Atlantic and then $6300.00 for the balance* daily, ~~or $U.S. currency per ton on the~~     126
~~Vessel's total deadweight~~     127
~~carrying capacity, including bunkers and stores, on                                summer freeboard, per 30 days,~~     128
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part     128
of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition.     129
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at     130
     131
     132
     133
                                                                      unless otherwise mutually agreed.     134

The Charterers shall give the Owners not less than **25,20,15,10,7,5,3,1**          days notice of the Vessel's     135
expected date and probable port of redelivery.     136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be     137
adjusted to GMT.     138

11.    **Hire Payment (also see Clause 82)**
     139

(a)    Payment
     140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in     141
                                , viz     142
     143
     144
                                                                                  in    145
                           ~~currency, or~~ in United States Currency, in funds available to the     145
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate     146
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day     147
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,     148
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to     149
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)     150
may otherwise have on the Charterers.     151
     152

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the     153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold     154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever     155
for any consequences thereof in respect of which the Charterers hereby indemnify the Owners, and hire     156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the     157
Charterers' account     158

(b)    *Grace Period*
     159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors     160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners     161
**3**          clear banking days (as recognized at the agreed place of payment) written notice to rectify the     162
failure, and when so rectified within those     **3**          days following the Owners' notice, the payment shall     163
stand as regular and punctual.     164

Failure by the Charterers to pay the hire within     **3**          days of their receiving the Owners' notice as     165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11(a) above     166





(c)   *Last Hire Payment*

167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be refunded by the Owners or paid by the Charterers, as the case may be.

168
169
170
171
172
173
174

(d)   *Cash Advances*

175

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required by the Owners, subject to 2½ percent commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

176
177
178

12.    **Berths** (also see Clause 78)

179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat at any time of tide.

180
181
182

13.    **Spaces Available**

183

(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle, apparel, furniture, provisions, stores and fuel.

184
185
186
187

(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.

188
189
190

14.    **Supercargo and Meals**

191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers' risk and see that voyages are performed with due despatch. He is to be furnished with free accommodation and same fare as provided for the Masters table, the Charterers paying at the rate of USD 8.00                per day. The Owners shall victual pilots and customs officers, and also, when authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc., Charterers paying at the rate of ———————————— per meal for all such victualling.

192
193
194
195
196
197

15.    **Sailing Orders and Logs**

198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing Directions, in writing, *in the English language*, and the Master shall keep full and correct deck and engine logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs, showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts required by the Charterers shall be in the English language.

199
200
201
202
203
204

16.    **Delivery / Cancelling**

205

If required by the Charterers, time shall not commence before                     and should the Vessel not be ready for delivery on or before                 but not later than      hours, the Charterers shall have the option of cancelling this Charter Party.

206
207
208





*Extension of Cancelling*      209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready 210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty 211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is 212
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will 213
cancel the Charter Party. Should the Charterers elect not to cancel; or should they fail to reply within two 214
days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date 215
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the 216
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers in 217
accordance with this Clause. 218

### 17.    Off Hire      219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency 220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the 221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, 222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless 223
resulting from inherent vice, quality or defect of the cargo, dry-docking for the purpose of examination or 224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of 225
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back 226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident 227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time 228
of her deviating or putting back until she is again in the same or equidistant position from the destination 229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners' 230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather, 231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses 232
resulting from such detention shall be for the Charterers' account. ~~If upon the voyage the speed be~~ 233
~~reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and~~ 234
~~the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be~~ 235
~~deducted from the hire.~~ 236

### 18.    Sublet      237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of 238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfilment of this 239
Charter Party. 240

### 19.    Dry docking      241

The Vessel was last dry docked 242

~~*(a) The Owners shall have the option to place the Vessel in dry dock during the currency of this Charter~~ 243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~ 244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~ 245

*(b) Except in case of emergency no dry docking shall take place during the currency of this Charter 246
Party. 247

* Delete as appropriate 248

### 20.    Total Loss      249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or 250
being last heard of) shall be returned to the Charterers at once. 251





| | | |
|---|---|---|
| 21. | **Exceptions** | 252 |

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always mutually excepted.

253
254
255

| | | |
|---|---|---|
| 22. | **Liberties** | 256 |

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

257
258

| | | |
|---|---|---|
| 23. | **Liens** | 259 |

The Owners shall have a lien upon all cargoes for any amounts due under this Charter Party, including general average contributions, and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to bereturned at once.

260
261
262
263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance, which might have priority over the title and interest of the Owners in the Vessel. The Charterers undertake that during the period of this Charter Party, they will not procure any supplies or necessaries or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.

264
265
266
267

| | | |
|---|---|---|
| 24. | **Salvage** | 268 |

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting Owners' and Charterers' expenses and crew's proportion.

269
270

| | | |
|---|---|---|
| 25. | **General Average** | 271 |

General average shall be: adjusted, according to York-Antwerp Rules 1974, as amended 1990, or any subsequent modification thereof, in *New York* and settled in *United States* currency.

272
273
274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason Clause" as per Clause 31.

275
276
277
278

Time charter hire shall not contribute to general average.

279

| | | |
|---|---|---|
| 26. | **Navigation** | 280 |

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew, and all other matters, same as when trading for their own account.

281
282
283

| | | |
|---|---|---|
| 27. | **Cargo Claims** | 284 |

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club New York Produce Exchange Agreement of February 1970, as amended May, 1984, or any subsequent modification or replacement thereof.

285
286
287





28.    **Cargo Gear and Lights**                                                          288

The Owners shall maintain the cargo handling gear of the Vessel, which is as follows:      289

**(see clause 52)**                                                                        290

providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also     291
provide on the Vessel for night work lights as on board, but all additional lights owner those on board shall     292
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If     293
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the     294
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or     295
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that     296
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned     297
thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If     298
required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which     299
case the Vessel shall remain on hire.                                                      300
                                                                                           301
                                                                                           302

29.    **Crew Overtime**                                                                   303

~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~     304
~~the Charterers shall pay the Owners, concurrently with the hire~~ ————————————per month     305
~~or pro rata.~~                                                                           306

30.    **Bills of Lading**                                                                 307

(a) The Master shall sign the bills of lading ~~or waybills~~ for cargo as presented in conformity with mates     308
or tally clerk's receipts. However, the Charterers may sign bills of lading ~~or waybills~~ on behalf of the     309
Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts.     310

(b) All bills of lading ~~or waybills~~ shall be without prejudice to this Charter Party and the Charterers shall     311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency     312
between this Charter Party and bills of lading signed by the Charterers or by the Master     313
at their request.                                                                          314

(c) Bills of lading covering deck cargo shall be caused "Shipped on deck at Charterers', Shippers' and     315
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for     316
any loss, damage, expense or delay howsoever caused."                                      317

31.    **Protective Clauses**                                                              318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading     319
or waybills issued hereunder:                                                              320

(a)    CLAUSE PARAMOUNT
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the     321
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national     322
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall     323
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the     324
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said     325
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such     326
term shall be void to that extent, but no further."                                       327
                                                                                           328

and                                                                                        329





**(b) BOTH -TO-BLAME COLLISION CLAUSE**

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any      330
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in      331
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against      332
all loss or liability to the other or, non-carrying ship or her owners insofar as such loss or liability represents      333
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other      334
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the      335
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.      336

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or      337
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or      338
contact."      339

and      340

**(c) NEW JASON CLAUSE**      341

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage      342
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the      343
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,      344
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the      345
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,      346
and shall pay salvage and special charges incurred in respect of the goods.      347

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship      348
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover      349
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,      350
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.      351

and      352

**(d) U.S. TRADE - DRUG CLAUSE**      353

"In pursuance of the provisions of the US. Anti Drug Abuse Act 1986 or any reenactment thereof, the      354
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested      355
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.      356

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences      357
of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel      358
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made      359
against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,      360
as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account      361
and the Vessel shall remain on hire.      362

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this      363
Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable      364
time the Vessel is released and at their expense put up the bails to secure release of the Vessel.      365

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the      366
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the      367
Vessel's personnel." *This clause in force only for bills of lading issued on cargo destined to the United States*      368
      369




and

370

(e) WAR CLAUSES

"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the
Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state
of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration
of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,
seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de
facto authority or any purported governmental organization maintaining naval, military or air forces).

371
372
373
374
375
376
377

(ii) If such consent is given, by the Owners, the Charterers will pay the provable additional cost of insuring
the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not
exceeding a valuation of **London insurance market level** In addition, the Owners' may purchase and the
risks such as loss of hire, freight disbursements,
total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a
government program, the Vessel shall not be required to enter or remain at any such port or zone.

378
379
380
381
382
383

(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter.
or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such
port or zone assume the provable additional cost of wages and insurance properly incurred in connection
with master, officers and crew as a consequence of such war, warlike operations or hostilities.

364
385
386
387

(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the
Charterers' account."

388
389

32.   War Cancellation

390

~~In the event of the outbreak of war (whether there be a declaration of war or not) between any two or
more of the following countries:~~

391
392
393
394

~~either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall
redeliver the Vessel to the Owners in accordance with Clause 10: if she has cargo on board, after
discharge thereof at destination or, if debarred under this Clause from reaching or entering it, at a near
open and safe port as directed by the Owners; or if she has no cargo on board, at the port at which she
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall
continue to be paid in accordance with Clause 11, and "except as, aforesaid" all other provisions of this
Charter Party shall apply until redelivery.~~

395
396
397
398
399
400
401
402

33.      Ice

403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area
where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and
remain in the port or area or to get out after having completed loading or discharging. Subject to the
Owners' prior approval the Vessel is to follow icebreakers when reasonably required with regard to her
size, construction and ice class.

404
405
406
407
408
409

34.      Requisition

410

~~Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter
Party, the Vessel shall be deemed to be off-hire during the period of such requisition, and any hire paid
by the said government in respect of such requisition period shall be retained by the Owners The period
during which the Vessel is on requisition to the said government shall count as part of the period provided
for in this Charter Party.~~
~~If the period of requisition exceeds _____ months, either party shall have the option
of cancelling this Charter Party and no consequential claim may be made by either party~~

411
412
413
414
415
416
417





1994

35.    Steyedore Damage  (see Clause 83 )

~~Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all~~
~~damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their~~
~~agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such~~
~~notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent~~
~~of such damage.~~

~~(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew~~
~~and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs~~
~~of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed~~
~~and if required passed by the Vessel's classification society~~

~~(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option~~
~~before or after redelivery concurrently with the Owners' work in such case no hire and/or expenses will~~
~~be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for~~
~~which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the~~
~~Owners' work~~

36.    Cleaning of Holds

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between
voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by
local regulations, at the rate of      **(see Clause 89)**                          per hold

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not
accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver
the Vessel with unclean/upswept holds against a lump sum payment of    *USD 1000.00*              in lieu of cleaning

37.    Taxes

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners
resulting from the Charterers' orders herein whether assessed during or after the currency of this Charter
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding
taxes levied by the country of the flag of the Vessel or the Owners).

38.    Charterers' Colors

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their
own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter
Party Cost and time of painting, maintaining and repainting those changes effected by the Charterers
shall be for the Charterers' account

39.    Laid up Returns

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum
period of 30  days if on full hire for this period or pro rata for the time actually on hire

40.    Documentation

The Owners shall provide any documentation relating to the Vessel that may be required to permit the
Vessel to trade within the agreed trade limits. including, but not limited to certificates of financial
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.

418
419
420
421
422
423
424
425
426
427
428
429
430
431
432
433
434
435
436
437
438
439
440
441
442
443
444
445
446
447
448
449
450
451
452
453
454
455
456
457
458
459




41.   **Stowaways**

(a)   (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii)  If despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b)   (i)  If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off-hire.

(ii)  Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

42.   **Smuggling**

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.

43.   **Commissions**

A commission of *1.25*              percent is payable by the Vessel and the Owners to *Altomar Maritime Inc. The commission is to be deducted at source. A commission of 1 percent is payable to Albatros Management Inc.*

on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

44.   **Address Commission**

An address commission of *2.50*              percent is payable to *Global Logistics Group Ltd. The commission is to be deducted at source.*

                                      on hire earned and paid under this Charter.

| 460 |
| 461 |
| 462 |
| 463 |
| 464 |
| 465 |
| 466 |
| 467 |
| 468 |
| 469 |
| 470 |
| 471 |
| 472 |
| 473 |
| 474 |
| 475 |
| 476 |
| 477 |
| 478 |
| 479 |
| 480 |
| 481 |
| 482 |
| 483 |
| 484 |
| 485 |
| 486 |
| 487 |
| 488 |
| 489 |
| 490 |
| 491 |
| 492 |
| 493 |
| 494 |
| 495 |
| 496 |





45.    **Arbitration**

(a)    NEW YORK

All disputes arising out of this contract shall be arbitrated at New York in the following manner, and subject to U.S. Laws

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of their shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc.

For disputes where the total amount claimed by either party does not exceed US $ _____ ** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators Inc.

(b)    LONDON

All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitration of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection be taken before the award be made. Any dispute arising hereunder shall be governed by English Law.

For disputes where the total amount claimed by either party does not exceed US $50,000.00 ** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

*Delete para (a) or (b) as appropriate

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions of this clause shall have full force and remain in effect

If mutually agreed, clauses **46** to **91** , both inclusive, as attached hereto are fully incorporated in this Charter Party.

| | |
|---|---|
| 497 |
| 498 |
| 499 |
| 500 |
| 501 |
| 502 |
| 503 |
| 504 |
| 505 |
| 506 |
| 507 |
| 508 |
| 509 |
| 510 |
| 511 |
| 512 |
| 513 |
| 514 |
| 515 |
| 516 |
| 517 |
| 518 |
| 519 |
| 520 |
| 521 |
| 522 |
| 523 |
| 524 |

**OWNERS**

**CHARTERERS**

American Global Logistics Inc.

As General Agents

for and on behalf of

Global Logistics Group Ltd.

ALTOMAR MARITIME INC.

1994



## Rider Clauses to M.V. Friendship
### Charter Party dated April 20, 2007

Altomar Maritime Inc.

~~Clause 46 – Breaking IWL~~
~~The Charterers have the right to break Institute Warranties Limit. The Charterers to reimburse extra insurance incurred thereby are entitled to have the benefit of any discounts received by the Owners for such extra insurance.~~

### Clause 47 – War Risk Insurance
Basic war risk insurance premium for worldwide trading shall be for Owners account and additional premiums including blocking and trapping shall be invoiced to Owners based on quotation from.............. for Hull and Machinery and officers/crew due to the vessel's trading to restricted area shall be for Charterers account. Owners undertake always to do their utmost to obtain cheapest additional premium (if any at all) from their Underwriters. *However it is understood that if Charterers willing the vessel to trade at war areas, this will be subject to Owners approval, as well as Owners H+M insurance and increase on the hire rate*

### Clause 48 – Change of Political Situation
Should political social and/or other situation change to the extent not to effect the vessel's trading to the excluded countries, the Charterers shall be allowed to make the vessel trade to such countries subject to the Owners consent which shall not be unreasonably withheld.

### Clause 49 – Black List
Owners guarantee that vessel is not Black Listed by any Arab League Countries or USA/Canadian Longshoreman's union. Owners guarantee vessel is not Black Listed by trading countries due to vessel's flag/Ownership/operators/age and whatsoever

### Clause 50 – Panama / Suez Canal transit
Owners guarantee that the vessel shall be fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificates during the currency of this charter to comply with current regulations and requirements of both Canals.

### Clause 51 – ITF
Owners guarantee that the vessel's officer and crew are employed under the terms and conditions of an ITF equivalent or affiliated trade union agreement.

### Clause 52 – Vessel's description:
MV FRIENDSHIP
SUMMER: 6.70 M / 5105.4 MT,
WINTER: 6.55 M / 5874 MT ,
TROPICAL: 6.83 M / 6273 MT.
L.O.A.: 100.73 M          L.B.P.: 94.60 M
EXTREME BREADTH: 16.52 M
INTERNATIONAL GRT/NRT: 4258 T/ 2315 MT
SUEZ CANAL TONNAGE GROSS/NETT: 4569.86 T /3676.02 T
PANAMA CANAL TONNAGE GROSS/NETT: 4258 T / 2315 T
TPC MT SUMMER/WINTER/TROPICAL: 14.274 T/ 14.18 T / 14.35 T
CUBIC BREAKDOWN OF ALL COMPARTMENTS GRAIN/BALE:  HOLD NO. 1 – 3785.12 M3
                                                 HOLD NO. 2 – 4169.25 M3
                                                 T O T A L   – 7954.37 M3
NUMBER OF DERRICKS/CRANES CAPACITY S.W.L.: CRANES – 2 / CAP. 20T
OUTREACH OF CRANES: 26 MTRS fm base
LOCATION OF CRANES: BET HATCH 1 & 2
HOISTING SPEED OF CRANES: FULLY LADEN – 20M/min. EMPTY LOAD – 40M/min
NUMBER OF HOLDS INCL.CLEAR UNOBSTRUCTED: 2 HOLDS/2 HATCHES
DIMENSIONS (LENGTH X BREADTH) ON TANKTOP (ADVISE
SLOPES/HOPPERS) AND HEIGHT IN HOLDS
TANK TOP: HOLD NO. 1 33.6 M X 12.0 M / HOPPER- W 1.3 M X H 1.1 M
          HOLD NO. 1 34.4 M X 12.0 M / HOPPER – W 1.3M X H 1.1 M
NUMBER / OF HATCHES AND DIMENSIONS: HATCH NO. 1 26.6 M X 11.8 M
                                    HATCH NO. 2 25.2 M X 11.6 M
STRENGTH ON TANKTOP/WEATHERDECK/HATCHCOVERS PER SQM/ALTERNATE





1994

### Rider Clauses to M.V. Friendship
### Charter Party dated April 20, 2007



Altomar Maritime Inc.

HOLDS WHICH MAY BE EMPTY: TANK TOP-10 MT/SQ.M.?
TYPE OF HATCHCOVERS WEATHERDECK : MACGREGOR SINGLE PULL TYPE /
HYDRAULIC
DISTANCE TANK TOP TO TOP OF HATCH COVER: 10 MTRS
DISTANCE TANK TOP TO TOP OF HATCH COAMING: 9.40 MTRS
DISTANCE WATER LINE TO HATCH COVER LADEN: 4.3 MTRS
                    BALLAST: 7.0 MTRS
DISTANCE FROM FRONT OF HATCH NO. 1 TO END OF HATCH NO. 2: 53.6 MTRS
LARGEST OBSTACLE BETWEEN HATCH COVERS: CRANE PEDESTAL: DIAM. 3.4 MTRS.
NUMBER/POSITION/TYPE OF WARPING DRUMS: 2 SETS / FWD AND AFT CENTER/
HYDRAULIC
NUMBER/TYPE/SIZE OF WARPING ROPES: 8 COILS/72MM X 120 MTRS / 8 STRANDS /
POLYPROPHYLENE MULTI FILAMENT
SUEZ CANAL/PANAMA CANAL FITTED: YES
ICE-STRENGTHENED: ICE CLASS B
WHERE/YEAR AND MONTH VESSEL WAS BLT: ZHEJIANG LINHAI, CHINA  2007 JUNE
FLAG: MALTA
PORT OF REGISTRY.   VALLETTA       REGISTRATION NO.: (PROVISIONAL) VALID 24
APR. 2008
ARE VESSEL'S HOLDS FREE OF ANY OBSTRUCTIONS: YES
IS VESSEL SUITABLE FOR GRAB DISCHARGE: SUITABLE
IS VESSEL GRAINFITTED: YES
IS VESSEL ITF FITTED: YES
$CO_2$ FITTED IN HOLDS: YES
ELECTRIC VENTILATION: YES
VESSEL TO BE IN POSSESSION OF INTERNATIONAL TONNAGE
CERTIFICATE: NO. SH064023 VALID; MARCH 21, 2008
DOES VESSEL HAVE GYRO COMPASS/SATELLITE NAVIGATION: YES
LIGHTSHIP/DRAFT OF VESSEL: 2066.6 T/1.95 MTRS.
AIRDRAFT : LOADED: 24. MTRS. /LIGHT: 26 MTRS
ACCOMODATION LADDER FTD: YES

SPEED AND CONSUMPTION:
SPEED AND CONSUMPTION TO BE UNDERSTOOD IN GOOD WEATHER CONDITION ARE TO BE
TAKEN AS WIND SPEED NOT EXCEEDING BEAUFORT SCALE 4 AND SEA STATE 3.


SPEED LOAD:  SERVICE: 11.5 KTS.
        ECO SPEEDS:

TYPE OF BUNKERS: IFO: 180 CST/ MGO
CONSUMPTION: IFO: 7.5 MT/DAY    MGO: 1.5 MT/DAY
IN PORT IDLE: 0.70 MT
IN PORT WORKING: 1.50 MT

MAIN ENGINE DETAILS: DIESEL ENGINE 6DKM-26,1  1912 Kw x 1,750 rpm
AUX. ENGINES:  DIESEL ENGINES NTA855-G2M,2  264Kw x 2, 400v

CAPACITIES:
—————————

1. FULL CAPACITY OF BUNKERS IN TONS:

   FUEL:  250 MT      MDO: 64 MT
2. CONSTANTS INCLUDING FRESHWATER (MAX.): 325 MT
3. FRESHWATER: 277 MT
4. FRESHWATER EVAPORATOR: DAILY PRODUCTION: NA





1994

Rider Clauses to M.V. Friendship
Charter Party dated April 20, 2007



VESSELS CALL SIGN: 9HCG9
RADIO STATION FOR COMMUNICATIONS WITH VESSEL:
VESSEL'S INMARSAT TELEX NO.: 425677810
        TEL/FAX : 761151689  /  761151691
CLASSIFICATION SOCIETY/CLASS: CHINA CLASSIFICATION SOCIETY (CCS) /
NOTATION *CSA *CSM

**Clause 53 – Deratting certificate**
The vessel shall be delivered with valid deratting certificate or deratting exemption certificate. If such certificate does not cover the whole period of this charter, costs or renewal of certificate and fumigation, if necessary, shall be for Owners account. Any detention and extra expenses incurred thereby shall be also for the Owners account.

**Clause 54 – Quarantined / Radio Pratique**
Normal quarantine time and expenses for the vessel's entering port shall be for Charterers account, but any time of detention and expenses for quarantine due to pestilence, illness etc., of Master, Officers and crew shall be for Owners account.

Further the vessel shall be in possession of valid certificates necessary to prepare radio pratique at port or ports where radio pratique is available.

**Clause 55 – Health Certificate**
The vessel shall be in possession of necessary certificates to comply with safety and health regulations and all current requirements at all port(s) of call during this charter.

**Clause 56 – Gain Loading Certificate**
Owners guarantee that the vessel is a self-trimming bulker and shall be suitable for carrying all kinds of grain in bulk without shifting boards, bagging of securing, subject to the requirements of the vessel's grain loading book. The vessel shall have the latest grain loading certificates in compliance with IMO regulations on board.

The vessel is also to load part cargoes of grain and / or other bulk cargoes and to shift between ports with holds empty and/or slack subject to the Master's approval, which shall not be unreasonably withheld.

**Clause 57 – Cargo Gear and Equipment**
The vessel's cargo gear and all other equipment shall comply with the regulations and/or requirements in effect at port(s) of call and canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession of valid and up to date certificates on board to comply with such regulations and/or requirements.

If stevedores, longshoremen or other laborers are not permitted to work by reason of any failure of the Master, the Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid and up-to-date certificates, the Owners shall make immediate corrective measures. The Charterers may suspend hire for time lost thereby and any extra expenses including stevedores' standby time shall be for Owners account.

**Clause 58 – WWF Requirement**
Owners guarantee that the construction of the vessel with her cargo gear, fittings and other equipment shall comply with the requirements and/or recommendations of Australian shore labour and pilots.

**Clause 59 – P and I Club**
Owners guarantee that the vessel is Class covered by P & I Club:

**Clause 60 – Owners Agents**
Charterer's agents at ports of call should take care of normal ships services. Should the vessel require any unusual assistance above and beyond normal husbandry matters, then the Owners are either to appoint their own supervisory agent to attend these matters or negotiate a reasonable fee with Charterers agent for





1994

**Rider Clauses to M.V. Friendship
Charter Party dated April 20, 2007**



Altomar Maritime Inc.

their services. If agents as per tariff are entitled to an agency fee for handling Owners matters, same always to be for Owners account.

**Clause 61 – Hire Survey**
A joint on/off hire survey including bunker survey is to be carried out with Owners and Charterers each contributing 50 percent to the relevant invoices.

If the hire period of the vessel commences at sea where it is physically impossible to have a surveyor in attendance at the time that the vessel is taken on hire by the Charterers, then Charterers will have the on-hire survey performed at the first port of call. Should the surveyor find deficiencies with the vessel and/or machinery and/or equipment and/or gear, then vessel to be placed off-hire until said deficiencies are repaired to the satisfaction of the Charterers surveyor and time not to count from the initial hire time.

Charterers reserve the right to cancel the charterparty should in the opinion of the on-hire surveyor that said deficiencies are too numerous and would cause the Charterer continued problems during the currency of the charterparty.

**Clause 62 – Oil Pollution**
The Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in, or leave any port, place, territorial or contiguous waters of any country or state in performance of this Charter Party. The Owners shall make all arrangements by bond or otherwise may be necessitate to satisfy such requirements at Owners sole expense.

The Owners shall indemnify the Charterers harmless against all consequences (including fines if any imposed on the Charterers) of oil or other pollution damage and any failure or inability of the Owners to do so as provided above.

In connection with the above reference is also made to a certificate of financial responsibility in compliance with requirements of the U.S. Water Quality Improvement Act of 1970 and any amendments thereto.

**Clause 63 – Deviation**
Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the vessel, or dry-docking or periodical survey, or deviate from the course of the voyage caused by sickness of or an accident to the Master, Officers, crew or any person on board the vessel other than persons traveling by the Charterers request, or by reason of sending stowaway(s) or refugee(s), salvage or by reason of refusal of the Master, Officers or crew to do their duties, or any Owners matters, the payment of hire shall be suspended from the time of inefficiency in port or area until the vessel is again efficient in the same position or regains a point of progress equivalent to that the hire ceased hereunder. Bunker consumed while the vessel is off-hire and all extra expenses incurred during such period shall be for the Owners account.

**Clause 64 – Capture, Seizure, Arrest**
Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party, ~~due to Owners fault,~~ Owners to ensure that vessel is released by posting a bond or similar guarantee as required by parties that took the action against the vessel. The payment of hire shall be suspended until the time of her release. If unless such capture or seizure to detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents ~~Owners~~ Charterers to still post the initial bond for the release of the vessel, and hire payments to be paid. Any extra expenses directly related to the vessel incurred by and/or during the above capture or seizure or detention or arrest shall be for the ~~Owners~~ Charterers account.

If the vessel has been off hire for a period of thirty (30) consecutive days, the Charterers are at liberty to cancel the balance period of this charter party and redelivery shall take place upon vessel being free of cargo.

During any off hire period estimated to exceed five (5) days, Owners or Master to provide Charterers with daily update of the vessel's position and estimated time of readiness.





Rider Clauses to M.V. Friendship
Charter Party dated April 20, 2007



Altomar Maritime Inc.

**Clause 65 – Preparation of loading / discharging**
The vessel's officers and crew shall perform shaping up of the vessel's hatches, and cranes and gangway prior to and upon arrival at a port in order to commence loading and/or discharging operations as soon as possible.

Opening and closing of all hatch covers and erecting and dismantling of shifting boards shall be performed by the officers and crew in addition to the usual operations performed by them, with free costs to the Charterers and unless prohibited by port regulations.

The Owners and the Master to undertake best efforts to cooperate with the Charterers for the best stowage of cargo and the Master / officers / crew to make best efforts to collect, restow, provide any useful dunnage, lashings, container fittings etc for the next use after completion of the voyage during this charter.

**Clause 66 – P + C**
All negotiations and fixture to be kept strictly private and confidential

**Clause 67 – BIMCO ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of the Charter Party, the Owners shall procure that both the vessel and the company (as defined by ISM Code) shall comply with the requirements of ISM Code.

Upon request the Owners shall provide a copy of the relevant document of compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in the Charter Party, loss, damage, expenses or delays by failure on the part of the Owners or the Company to comply with the ISM Code shall be for Owners account.

~~Clause 68 – Bulk Carrier Safety Clause~~
~~(a) The Charterers shall instruct the Terminal Operators or their representatives to co-operate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.~~
~~(b) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the Terminal Operators to load/discharge the Vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.~~
~~(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.~~
~~(d) Compliance with the provisions of this Clause shall not affect the counting of laytime.~~

**Clause 69 – USDA / NCB Clause**
~~Owners guarantee that the vessel is free fro Asian Gypsy Moth and never called CIS Pacific ports since March 2002 otherwise Owners guarantee to be responsible for any consequences caused there from.~~

Furthermore Owners guarantee that the vessel meets all National Cargo Bureau / United States Department of Agricultural plant protection and quarantine office regulations.

**Clause 70 – Hull and Machinery**
Hull and Machinery insured with

**Clause 71 – Bunkers on Delivery**





### Rider Clauses to M.V. Friendship
### Charter Party dated April 20, 2007



Vessel to be delivered with    mt IFO and    mt MDO. Price of bunker are USD    for IFO and USD  for MDO, same price on redelivery. Charterers are to pay cost of bunker as o/b on delivery together with 1st hire payment. Owners are to pay for bunkers on redelivery.

### Clause 72 – Cargo Trading Exclusion
None of the cargoes, goods, or substances listed below are to be loaded during the currency of this charter:

arms, ammunitions, explosives a/o combustible a/o inflammable a/o injurious cargoes, acids, asphalt a/o its products, ammonia chlorine, asbestos, bitumen, bulk cement, bulk cement clinkers, bulk pyrites, bones, bone meal, borax, boycott cargoes, charcoal, calcium carbite, calcium hypochlorite, carbite, caustic soda, coal, copra a/o its products, corrosives, cottonseed expellers, creosoted goods, direct reduced iron, detonator caps, ferrosilicon, fishmeal, fluorspar, gaseous coal, gasoline, granite blocks or any other stone blocks, hides, hot briquetted iron, hypochlorite solutions, logs, limestone, livestock, motor spirit, manioc and/or manioc pellets, motor blocks, naphta, nefiline syenite, nigerseeds, nitrate of soda, oilcakes, oily pieces, oily expellers, organic peroxides, palm kernels, pond coal, potassium chlorate, petroleum, petroleum derivatives and all its products, pesticides, pitch, pollard pellets, quebracho, radioactive a/o nuclear products a/o their wastes, radioisotopes, resins, solvents, salt, silicon manganese, sunflower seed expellers, sulphate in bulk, sponge iron, tar, tea, tobacco, toxic products, turpentine, turnings, zinc ashes, zircon sand

Scrap is allowed as long as it is non oily/non greasy. No scrap turnings allowed.

### Clause 73 – Trading Limits
Turkish occupied Cyprus, Israel, North Korea, C.I.S Pacific, Cambodia, Myanmar, Somalia, Eritrea, Yemen, Nigeria and Bakassi Peninsula, Cabinda, Sierra Leone, Liberia, Conakry, Zaire, UN or EEC sanctioned countries, Mauritania, Haiti, Tanzania, Mozambigue(but Maputois allowed),New Zealand, Australia, Tasmania, Papua New Guinea.
Also vessel not to trade in countries where is prohibited by the vessel's flag state and any gypsy moth infested area.

Should the vessel become infested with asian gypsy moths during the currency of this charter party due to Charterers failure to comply with the above trading restrictions,then Charterers shall be fully responsible for all delays, costs, expenses to reinstate the vessel in her state prior to the infestation and will indemnify Owners for any loss of  time,liability, damages and costs arising from such breach of the charter party terms.

Trading always with in ice free ports, vessel not to force or push ice or to follow icebreaker(s).

No direct trade is allowed between Taiwan and People's Republic of China or vice versa.

Azov Sea is allowed subject to IWL.

Indonesian logs trade is not allowed

Japan call asian gypsy moth clause
————————————————————
Owners agree all Japanese ports included in trading provided Charterers will obtain prior sailing from each Japanese port of call phytosanitary certificate for asian gypsy moth in strict conformity with U.S.A or Canadian ports / waters.

### Clause 74 – Vessel redelivery
Mediterranean , Continent, Black Sea

### Clause 75 – Bill of Lading
No through or Liner Bills of Lading will be issued

Bill(s) of Lading  to be signed by Master or Agents in accordance with the Charterers written instructions, but always in accordance with Mates Receipts unless LOI provided for clean Bill(s) of Lading due minor acceptable normal conditions (i.e. atmospheric rust). Where it is customary in grain/agriproduct trading Mate's Receipt to be issued in accordance with elevators figure or as per draft survey.





### Rider Clauses to M.V. Friendship
### Charter Party dated April 20, 2007



Altomar Maritime Inc.

At discharging port cargo to be released against original of respective Bill(s) of Lading. In case original Bill(s) of Lading have not arrived in time to discharging port, Owners agree to discharge cargo as per Charterer's written instructions and against LOI as per Owner's PANDI club wording issued/signed by Charterers on their letterhead. LOI to be presented to Owners with a copy of the Bill(s) of Lading in question. Charterers will keep Owners advised about actual arrival of the Bill(s) of Lading. Charterers to indemnify Owners against any claims or damages arising from Bill(s) of Lading being not in conformity with Mate's Receipts.

### Clause 76 – Fumigation
Owners warrant that vessel is suitable for in-transit fumigation when same is required at ports of loading when vessel has loaded either bulk or bagged agricultural products. Charterers have the liberty to fumigate the cargo on board at loading and discharging port or places en route at their risk and expenses, and on their responsibility that officers and crew as well as all other persons on board the vessel during and after fumigation are not exposed to any health hazards whatsoever. Charterers undertake to pay owners all necessary expenses incurred because of the fumigation and time lost thereby shall count as time on timecharter.

### Clause 77 – NAABSA
Charterers have the option NAABSA for such vessels size and construction available where customary in Lagos, Buenaventura, Argentina, Uruguay and Brazil (but not north of Vitoria).

### Clause 78 – Communication Expenses
Cable and communication expenses shall be USD 1200.00 per month pro rata.

### Clause 79 – Owners banking details
HOLLANDSCHE BANK- UNIE N.V (HBU) ROTTERDAM
HOLLAND ACCOUNT NUMBER:
51.83.24.524

CORR/NT BANK:
-ABN AMRO BANK NEW YORK
SWIFT: ABNAUS33

### Clause 80 – U.S. Customs 24 hour rule
(a) If loading cargo destined for the US or passing through US ports in transit, the Charterers shall:

(i) Provide all necessary information, upon request by the Owners, to the Owners and/or their agents to enable them to submit a timely and accurate cargo declaration directly to the US Customs; or
(ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto, submit a cargo declaration directly to the US Customs and provide the Owners with a copy thereof.

In all circumstances, the cargo declaration must be submitted to the US Customs latest 24 hours in advance of loading.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with the provisions of sub-clause (a).

(c) If the Vessel is detained, attached, seized or arrested as a result of the Charterers' failure to comply with the provisions of sub-clause (a), the Charterers shall provide a bond or other security to ensure the prompt release of the Vessel. Notwithstanding any other provision in this Charter Party to the contrary, the Vessel shall remain on hire.

### Clause 81 – Hire Payments
Not withstanding clause 11, if hire payment falls on either Saturday or Sunday, then Charterers have the option to remit the hire payment either on the preceeding Friday or the following Monday.

### Clause 82 – Stevedore Damage





### Rider Clauses to M.V. Friendship
### Charter Party dated April 20, 2007



Altomar Maritime Inc.

The Charterers are not to be held responsible for any damages to the vessel incurred during the loading and discharging operations, unless the Master advises the Charterers or their agents or the party causing the damages within 24 working hours of the damage done to the vessel for which they are liable and endeavours to obtain, if at all possible, their admission of liability.

Hidden damages are to be notified within 24 working hours after discovery, but in any case not later than the completion of the voyage where the damages occurred, plus one week. Copies of correspondence together with the original letters acknowledging liability, if obtained, to be sent to the Charterers as soon as possible. Should the damages effect the seaworthiness or commercial operations of the vessel, then these damages are to be repaired at the Charterers risk and expense and prior to redelivery, and the vessel remaining on hire without interruption.

The Charterers are to settle the stevedore damage with the Owners upon receipt of the stevedore damage claim, whether the Charterers have settled with the Sub-Charterers/stevedores or not.

### Clause 83 – Weather Routing Service
The Charterers have the option of providing the vessel with a weather routing services with all costs in this respect for the account of the Charterers. The Master at his reasonable discretion may not follow the suggested route, in which case he is to detail in the log book the reason for departing from same and advise the Charterer's and the weather routing service accordingly.

### Clause 84 – ISPS
(a)       (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Notwithstanding anything else provided in this Charter Party, any loss, damage, expense or delay, and the cost of any extra bunkers consumed, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account and may be deducted from hire.

(b)       (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details.

(ii) Except as otherwise provided, any loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)       All delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses are incurred as a result of the Owners' non-compliance with any aspect of the ISPS Code, or result from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)       If Charterers make any payment which is for the Owners' account according to this Clause, such payment may be deducted from hire.

### Clause 85 – Breakdown
Notwithstanding clauses 17 and 39, should the vessel develop engine problems and/or mechanical problems and/or equipment problems and/or problems with the vessel's gear and where such problems renders the vessel inoperative for a period of time, Charterers may seek compensation from the Owners.





1994

### Rider Clauses to M.V. Friendship
### Charter Party dated April 20, 2007



Altomar Maritime Inc.

If said problems hinders the current voyage of the vessel or immediate future employment where the vessel will have to undergo repairs to rectify and put back into the same condition, and where said repairs are to longer than 7 days, Master and/or Owner's must give Charterer's in writing daily notices commencing with a five day notice. Should Charterer's fail to receive notices, then one day will be added for every day that Master and/or Owner's fail to update Charterer's of vessel's return date.

If said problems result in lost immediate future employment, where vessel is left open spot, then Charterer's will take vessel back on hire when vessel is on her first laycan date.

### Clause 86 – Watertightness
Owners guarantee that vessel's hatchcovers are to be watertight throughout this charter period and if any hatchcovers are found to be defective, same to be rectified at Owners time and expense to Charterer's satisfaction. Charterers have the right to carry out hose test on all hatches at any time during this charter period, *provided giving notice to the Owners/Master.*

### Clause 87 – Additional equipment / fittings
The Charterer's, subject to the Owners approval which shall not be unreasonably withheld, shall be at liberty to fit/weld additional equipment and fittings for loading/discharging and/or securing cargo. Such works shall be done at Charterers' expense and time and the Charterers shall be at liberty to remove such equipment and fittings at their expense and time prior to redelivery.

### Clause 88 – Holds Condition on Delivery
Vessel holds on delivery to be clean/swept/washed down by fresh water and dried up as to receive Charterers intended cargoes in all respects, free of salt, rust scale and previous cargo residues to the satisfaction of the on-hire surveyors.

The surveyor may apply a silver nitrate test to check the above conditions and if the vessel fails to pass any holds inspection/test as above, the vessel will be placed off-hire from failure of inspection until the vessel passes the same inspection/test again. Any extra expenses directly related to the above will be for Owners account.

Owners guarantee that the vessel's holds are to be clear of any fittings/super structures, *as per description*

### Clause 89 – Intermediate hold cleaning
Not withstanding Clause 36 paragraph one, intermediate hold cleaning is to be done by the crew. Charterers will pay Master*/Owner* USD *300.00* per hold*/operation* for sweeping only or USD *400.00* per hold*/operation* for sweeping and washing.

If shore labour is used to clean holds, then Charterers will not pay Master*/Owners* this service.

Charterers may, at their discretion, arrange to pay Master direct a specified amount if Master/Crew assist shore labour in the hold cleaning.

*Delete as appropriated*

### Clause 90 – Performance of the vessel – Speed and Consumption
Unless otherwise ordered by Charterers, the vessel shall perform all voyages at the service speed declared by the Owners in their description of the vessel as stated in Clause 52 of the Charter Party.

Owners warrant that the vessel is and shall remain capable of maintaining, throughout the Charter Period, the speeds and bunker consumptions for propulsion described in Clause 52 under normal working conditions and in moderate weather. *Speed always basis 3 Beaufort*





ALTOMAR MARITIME INC.
1994

**Rider Clauses to M.V. Friendship
Charter Party dated April 20, 2007**



Altomar Maritime Inc.

The speed and consumption warrantees of the time charter are to apply whether the vessel is fully or partly loaded or in ballast and shall be computed from pilot station to pilot station on all sea passages while the vessel is on hire.

Charterers shall have the right to make deductions from hire in respect of any time lost and any additional bunkers consumed by reason of the vessel's failure to maintain warranted capability.

Bunker prices shall be calculated at the prices of the last port where bunkers were supplied.

**Clause 91 – Sale of Vessel**
If, during the currency of this charter party, Owners elect to sell the vessel, Owners to give to Charterers 30 days notice of said intention. The existing charter party dated 24/04/07 is to be transferred to the new Owners in its entirety and in full force, with no amendments whatsoever and with no possibility of cancellation by the new owners.

All other terms / conditions to remain as per present charter party





**Addendum**
**to M.V. Friendship**
**Charter Party dated April 20th 2007**



Altomar Maritime Inc.

With reference to Clause no.1 it is agreed that the Charter Party will be extended a further 9 months for a total of 24 months, 15 days more or less in Charterer's option.

It is also agreed that commencing on the 16th month, the hire rate will be amended to USD 6,700.00 per day, otherwise as per Clauses 10 and 11 of the Charter Party.





A. SPECIFICATIONS:
----------------------

1. NAME/EX-NAME/TYPE OF VESSEL: **MV FRIENDSHIP**
2. DWAT METRIC TONS SUMMER/WINTER/TROPICAL AND CORRESPONDING DRAFTS:
   SUMMER: **6.70 M / 6105.4 MT, WINTER: 6.55 M / 5874 MT , TROPICAL: 6.83 M / 6273 MT.**
3. L.O.A.: **100.73 M**       L.B.P.: **94.60 M**
4. EXTREME BREADTH: **16.62 M**
5. INTERNATIONAL GRT/NRT: **4258 T/ 2315 MT**
6. SUEZ CANAL TONNAGE GROSS/NETT: **4569.86 T /3676.02 T**
7. PANAMA CANAL TONNAGE GROSS/NETT: **4258 T / 2315 T**
8. TPC MT SUMMER/WINTER/TROPICAL: **14.274 T/ 14.18 T / 14.35 T**
9. CUBIC BREAKDOWN OF ALL COMPARTMENTS GRAIN/BALE:  HOLD NO. 1 – 3785.12 M3
                                                    HOLD NO. 2 – 4169.25 M3
                                                    T O T A L   – 7954.37 M3
10. NUMBER OF DERRICKS/CRANES CAPACITY S.W.L.: **CRANES – 2 / CAP. 20T**
    OUTREACH OF CRANES: **26 MTRS fm base**
    LOCATION OF CRANES: **BET HATCH 1 & 2**
    HOISTING SPEED OF CRANES: **FULLY LADEN – 20M/min, EMPTY LOAD – 40M/min**
    CRANE CYCLES PER HOUR:
    GRAB FITTED: **NA**      NO. OF GRABS: **NA**
    IF GRABS ON BOARD, PAYLOAD AND CUBIC OF GRABS: **NA**
12. NUMBER OF HOLDS INCL.CLEAR UNOBSTRUCTED: **2 HOLDS/2 HATCHES**
    DIMENSIONS (LENGTH X BREADTH) ON TANKTOP (ADVISE
    SLOPES/HOPPERS) AND HEIGHT IN HOLDS
    TANK TOP: **HOLD NO. 1 33.6 M X 12.0 M / HOPPER- W 1.3 M X H 1.1 M**
             **HOLD NO. 1 34.4 M X 12.0 M / HOPPER – W 1.3M X H 1.1 M**
13. NUMBER / OF HATCHES AND DIMENSIONS: **HATCH NO. 1 26.6 M X 11.6 M**
                                        **HATCH NO. 2 25.2 M X 11.6 M**
14. STRENGTH ON TANKTOP/WEATHERDECK/HATCHCOVERS PER SQM/ALTERNATE
    HOLDS WHICH MAY BE EMPTY: **TANK TOP-10 MT/SQ.M.?**
15. WEATHERDECK SPACE WITHOUT OBSTACLE? **NONE**
16. TYPE OF HATCHCOVERS WEATHERDECK : **MACGREGOR SINGLE PULL TYPE /
    HYDRAULIC**
17. DISTANCE TANK TOP TO TOP OF HATCH COVER: **10 MTRS**
18. DISTANCE TANK TOP TO TOP OF HATCH COAMING: **9.40 MTRS**
19. DISTANCE WATER LINE TO HATCH COVER LADEN: **4.3 MTRS**
                                     BALLAST: **7.0 MTRS**
20. DISTANCE FROM FRONT OF HATCH NO. 1 TO END OF HATCH NO. 2: **53.6 MTRS**
21. LARGEST OBSTACLE BETWEEN HATCH COVERS: **CRANE PEDESTAL:  DIAM. 3.4 MTRS.**
22. NUMBER/POSITION/TYPE OF WARPING DRUMS: **2 SETS / FWD AND AFT CENTER/
    HYDRAULIC**
23. NUMBER/TYPE/SIZE OF WARPING ROPES: **8 COILS/72MM X 120 MTRS / 8 STRANDS /
    POLYPROPHYLENE MULTI FILAMENT**
24. SUEZ CANAL/PANAMA CANAL FITTED: **YES**
25. ICE-STRENGTHENED: **ICE CLASS B**
26. DOES VESSEL HAVE VHF RADIO: **YES**
27. DOES VESSEL HAVE TELEX/FAX/INMARSAT: **YES**
28. WHERE/YEAR AND MONTH VESSEL WAS BLT: **ZHEJIANG LINHAI, CHINA  2007 JUNE**
29. FLAG: **MALTA**
30. PORT OF REGISTRY:  **VALLETTA**      REGISTRATION NO.: **(PROVISIONAL) VALID 24
    APR. 2008**
31. ARE VESSEL'S HOLDS FREE OF ANY OBSTRUCTIONS: **YES**
32. IS VESSEL SUITABLE FOR GRAB DISCHARGE: **SUITABLE**





33. IS VESSEL GRAINFITTED: YES
34. IS VESSEL ITF FITTED: YES
35. CO2 FITTED IN HOLDS: YES
36. ELECTRIC VENTILATION: YES
37. VESSEL TO BE IN POSSESSION OF INTERNATIONAL TONNAGE
    CERTIFICATE: NO. SH064023 VALID; MARCH 21, 2008
38. DOES VESSEL HAVE GYRO COMPASS/SATELLITE NAVIGATION: YES
39. LAST THREE CARGOES: NA
40. LAST DRYDOCK: NEW BUILDING        SPECIAL SURVEY: NA
41. LIGHTSHIP/DRAFT OF VESSEL: 2066.6 T/1.95 MTRS.
42. AIRDRAFT : LOADED: 24. MTRS. /LIGHT: 26 MTRS
43. ACCOMODATION LADDER FTD: YES
44. ISM STATUS OF OWNERS/MANAGERS/VSL CONFIRMED: CONFIRMED


B. SPEED AND CONSUMPTION:
-----------------------

SPEED AND CONSUMPTION TO BE UNDERSTOOD IN GOOD WEATHER CONDITION ARE TO
BE TAKEN AS WIND SPEED NOT EXCEEDING BEAUFORT SCALE 4 AND SEA STATE 3.


1. SPEED LOAD:   SERVICE: 11.5 KTS.
         ECO SPEEDS:

2. SPEED BALLAST: SERVICE:
         ECO SPEEDS

3. TYPE OF BUNKERS: IFO: 180 CST/ MGO
4. CONSUMPTION: IFO: 7.5 MT/DAY    MGO: 1.5 MT/DAY

   IN PORT IDLE: 0.70 MT
   IN PORT WORKING: 1.50 MT

5. MAIN ENGINE DETAILS: DIESEL ENGINE 6DKM-28,1  1912 Kw x 1,750 rpm
   AUX. ENGINES:  DIESEL ENGINES NTA855-G2M,2  264Kw x 2, 400v


C. CAPACITIES:
-------------

1. FULL CAPACITY OF BUNKERS IN TONS:

   FUEL: 250 MT       MDO: 64 MT
2. CONSTANTS INCLUDING FRESHWATER (MAX.): 325 MT
3. FRESHWATER: 277 MT
4. FRESHWATER EVAPORATOR: DAILY PRODUCTION: NA


D. FOR OPERATIONAL PURPOSES:
-------------------------

   1. NAME/DOMICILE OF OWNERS: EVER FRIENDSHIP NAVIGATION LTD
                18/2 SOUTH STREET




VALLETTA VLT11

MALTA

NAME/DOMICILE OF VESSEL'S MANAGERS: **HELLAS MARINE SERVICES LTD.**
**116, KOLOKOTRONI STR. 185-35**
**PIRAEUS, GREECE**

NAME/DOMICILE OF VESSEL'S DISPONENT OWNERS:

2. NAME OF INDIVIDUAL OPERATIONS:
   CHARTERING:
3. ADDRESS:
   TEL:                FAX:
5. TELEX:
6. CABLE ADDRESS:
7. VESSELS CALL SIGN: **9HCG9**
8. RADIO STATION FOR COMMUNICATIONS WITH VESSEL:
   VESSEL'S INMARSAT TELEX NO.: **425677810**
   TEL/FAX : **761151689  /  761151691**
9. NAME AND NATIONALITY OF MASTER: **CAPT. EDGARDO MAGRACIA  /  FILIPINO**
   NATIONALITY OF OFFICERS/CREW: **ALL FILIPINO**
10. P AND I CLUB:
11. HULL UNDERWRITERS:
12. HULL AND MACHINERY VALUE FOR INSURANCE PURPOSES:
13. NUMBER OF U.S. POLLUTION CERTIFICATE:
14. CLASSIFICATION SOCIETY/CLASS: **CHINA CLASSIFICATION SOCIETY (CCS) /**
    **NOTATION *CSA * CSM**
15. BROKER THROUGH WHOM CORRESPONDENCE IS TO BE CHANNELED:
    FULL ADDRESS:
    TEL:
    FAX:
    E-MAIL:
16. ANY COLLISION/STRANDING/FIRE/GENERAL AVERAGE/ACCIDENT DURING
    LAST 12 MONTH: NIL
17. IF YES, PLEASE STATE DETAILS OF INCIDENT/ACCIDENT: NA
18. VSL FREE FROM OF ANY ENCUMBRANCES A/O ANY MARITIME LIEN: NA
19. VESSEL IS FINANCED THROUGH MORTAGEE BANK
20. MORTGAGED AMOUNT USD:        DATE:
21. NAME/FULL STYLE OF MORTGAGOR:
22. PLEASE CONFIRM THAT THE OWNERS/MORTGAGOR HAS COMPLIED FULLY
    WITH ALL TERMS OF MORTGAGE AGREEMENT WHILST TRADING UNDER
    THIS C/P :
23. TO BE SENT BY COURRIER
    A) 1 COPY GENERAL ARRANGEMENT PLAN : **OK**
    B) 1 COPY CARGO CAPACITY PLAN: **OK**
24. TO BE FAXED 1-514-388-5436 OR SENT BY EMAIL
    **CLASS CERTIFICATE**
    **CERTIFICATE OF REGISTRY**
    **CERTIFICATE OF SAFETY**
    **INTERNATIONAL SHIP SECURITY CERTIFICATE**
    **INTERNATIONAL LOAD LINE CERTIFICATE**
    **SAFETY CONSTRUCTION**
    **SAFETY EQUIPMENT**
    **SAFETY RADIO**
    SAFETY GEAR
    **INTERNATIONAL OIL POLLUTION CERTIFICATE**
    **SAFTEY MANAGEMENT CERTIFICATE**
    **DOCUMENT OF COMPLIANCE**



**Addendum No. 3 to M.V. Friendship**
**Charter Party dated April 20, 2007**



Altomar Maritime Inc.

Hire to continue usd 5300 up to the end of the charter the agreed period rate difference till then usd 6300- 5300 = usd 1000 total amount7 months  210 days x usd 1000= usd 210000 to be paid to the Owners as baloon payment the end of the period

Charterers

**GLOBAL LOGISTICS GROUP LTD.**

Owners

**EVER FRIENDSHIP NAVIGATION LTD. OF MALTA**

American Global Logistics Inc.
As General Agents
for and on behalf of
Global Logistics Group Ltd.

**Addendum No. 2 to M.V. Friendship**
**Charter Party dated April 20, 2007**



Altomar Maritime Inc.

Clause 56 shall read as follows:

**Clause 56 – Gain Loading Certificate**
Owners guarantee that the vessel is a bulker and shall be suitable for carrying all kinds of grain in bulk , subject to the requirements of the vessel's grain loading book. The vessel shall have the latest grain loading certificates in compliance with IMO regulations on board.

CERTIFICATE OF P&I ENTRY
**INTERNATIONAL TONNAGE CERTIFICATE**
**CERTIFICATE OF DERATIZATION**
CERTIFICATE OF HULL AND MACHINERY VALUE
CERTIFICATE OF FINANCIAL RESPONSIBILITY
**ISPS CERTIFICATE**



